**[PROPOSED AMENDED] DECLARATION OF HAREL TALASAZAN IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF**

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

HAREL TALASAZAN

        Plaintiff,

v.

MICROSOFT CORPORATION,
OFFICE OF BAR COUNSEL,
BOARD OF BAR OVERSEERS,
DOROTHY ANDERSON,
MATTHEW STEWART, and
DOES 1-25

        Defendants.

[PROPOSED AMENDED]

Civil Action No. 1:22-CV-11764-DJC

**DECLARATION OF HAREL TALASAZAN IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF**

I, Harel Talasazan ("Talasazan" or "I" or "Me") hereby state as follows upon information and belief:

1. I am an Attorney licensed to practice law in the Commonwealth of Massachusetts. I reside in Los Angeles, California. I make the following statements upon my personal knowledge and belief in support of the Motion for Injunctive Relief.

2. Subject to and without waiving the legal order I made to Bank of America to put aside the interest for and in my Interest on Lawyers Trust Account ("IOLTA") in a separate interest bearing escrow account, at all relevant times in the instant case, I

have had an IOLTA account which I had opened shortly after I became licensed to practice law in Massachusetts.

3. The Massachusetts Interest on Lawyers Trust Accounts Committee of the Supreme Judicial Court ("IOLTA Committee") is an agent of the Supreme Judicial Court entrusted to administer and oversee the Interest on Lawyers Trust Accounts ("IOLTA") program. The IOLTA Committee operates a website where financial institutions can submit remittances from attorney IOLTA accounts to the IOLTA Committee. A true and correct copy of the "Operations Handbook for Financial Institutions" dated 2013 ("handbook") is appended herewith as **Exhibit 1**.

4. As a result from the outbreak of the novel coronavirus 2019 disease ("Covid") pandemic, and the public health emergency declared in Massachusetts and California, among other states, many "non-essential" businesses, including the brick-and-mortar branches of Bank of America were closed.

5. At the time the handbook was first issued to financial institutions, the IOLTA Committee was located at 7 Winthrop Square Third Floor Boston, Massachusetts 02110-1245. See Exhibit 1, Pg. 4.

6. The submission of interest payable to the IOLTA Committee information via internet enabled remittances, as stated in the handbook, was and still is made by and through the "MAIOLTASECURE.COM" website. See Exhibit 1, Pg. 35 (below "SUBMISSION INFORMATION"); (See also Exhibit 3, infra, pgs. 88, 89-90, 93-96). A true and correct copy of the IOLTA Committee website, accessed and printed March 9, 2023 at 6:54 P.M. Pacific Standard Time, including the bank log-in information link to "MAIOLTASECURE.COM" (at the top right corner) on pg. 1 is

2

appended herewith as **Exhibit 2**.

7. On or about November 6, 2022 I had discovered irregularities concerning the financial records pertaining to the IOLTA Committee. (See Exhibit 3, infra, pgs. 9, 14 (*exact* name of corporation "Ting Inc." and "Ting Inc" respectively, *notice* there is a period after "Inc." in the former, and there is **no** period after the "Inc" in the latter)) (collectively referred to herein as "Ting"); See also Motion to Re-Issue Summonses (regarding events or occurrences on November 6, 2022).

8. On or about November 9, 2022 I mailed via United States Postal Service (USPS) certified priority mail, return receipt requested, a demand to preserve evidence letter, included therein were public records relevant to "Ting", which, upon information and belief, is an American internet service provider founded by "Tucows" a Canadian entity, in or around 2012. A true and correct copy of the said demand letter, including the public records relevant to matters to be so preserved, is appended herewith as **Exhibit 3**. The IOLTA Committee was copied and provided the same said demand letter, including the public records relevant to matters to be preserved. See Exhibit 3, Pg. 1.

9. The IOLTA Committee's website, available for the public, is "maiolta.org" and, based on the Internet Corporation for Assigned Names and Numbers[1] registration data lookup tool, the "Contact Information" beginning with the "Registrant:" through and up to "Billing:" names "Registration Private" but the "Kind [of person to e-mail]:

---

[1] The Internet Corporation for Assigned Names and Numbers is an American multistakeholder group and nonprofit organization responsible for coordinating the maintenance and procedures of several databases related to the namespaces and numerical spaces of the Internet, ensuring the network's stable and secure operation. See Footnote 2, infra; 1 The Law of Electronic Commercial Transactions Ch. 7 (Domain Names and Jurisdiction).

[is an] Individual". <u>See</u> Exhibit 3, pgs. 83-84. Said IOLTA Committee domain name
is registered with "Domains by Proxy, LLC", a subsidiary of "GoDaddy.com, LLC".
<u>See</u> Exhibit 3, pgs. 82-87; <u>See also</u> Exhibit 4, infra. A true and correct copy of the
Arizona Corporation Commission's entity information regarding said Domains by
Proxy, LLC is appended herewith as **Exhibit 4.**

10. Unlike the "maiolta.org" website described in the preceding above, the publicly
available information regarding the bank log in website for IOLTA remittances
("maioltasecure.com"), via the ICANN registration data lookup tool, lists a
*"individual"* as the "Registrant" and redacts for privacy the "Admin", "Technical",
and "Billing" Sections thereunder. <u>See</u> Exhibit 3, pgs. 82-87 (regarding
"maiolta.org"); <u>See</u> Exhibit 3, pg. 94 (regarding "maioltasecure.com").

11. A search concerning the *exact name* with the Massachusetts Secretary of State,
Corporations Division records, shows that "Tucows, Inc." is *not* a corporation
registered therewith. <u>See</u> Exhibit 3, pg. 9 (*exact* name of corporation "Ting Inc."
[*notice* there is *a period mark* after the "Inc."]; <u>Compare</u> Exhibit 3, pg. 14 (*exact*
name of corporation) "Ting Inc" [*notice* there is *no* period mark after the "Inc."]. Nor
is there any separate and distinct corporate entity named by the aforementioned
named entities that is, namely "Tucows, Inc.". <u>See</u> Exhibit 3, pgs. 9, 14.

12. The irregularities existing with other public record entities do not pare any better
elsewhere, among other records *infra*, the Uniform Resource Identifier[2] (URI)

---

[2] In *Drauglis v. Kappa Map Group, LLC*, 128 F. Supp. 3d 46, at pgs. 56-57 Dist. Court, Dist. of Columbia
(2015), the court defined Uniform Resource Locator (URL) and Uniform Resource Identifier (URI).
While there is no legal authority on this point, Internet authorities have defined a Uniform
Resource Identifier ("URI") as "an identifier consisting of a sequence of characters .... [which]
enables uniform *57 identification of resources via a separately defined extensible set of naming
schemes." T. Berners-Lee,[7] et al., Uniform Resource Identifier: Generic Syntax 5 (Jan.2005),
Network Working Grp., https://tools.ietf.org/html/std66 (last visited Aug. 18, 2015). There is more

concerning the "Registrant" on page 94 of Exhibit 3 identified "Tucows, Inc" (notice, there is no period after the preceding said "Inc"). See also Exhibit 3, Pgs. 89-90 ("*Tucows, Inc* will keep a log of the e-mail addresses provided on this form, along with a date and time of the request. . . Bonn, Germany[.]") (emphasis added).

13. In order to understand the model, or pathways pertaining to the malfeasance of, or defalcations from the IOLTA account by the IOLTA Committee, the independent financial auditors' report, which is prepared (generally speaking), and made a public record (generally) every year must be closely examined, for it provides important details on the operation and function of the IOLTA Committee. A true and correct copy of the "MASSACHUSETTS IOLTA COMMITTEE FINANCIAL STATEMENTS [for] YEARS ENDED DECEMBER 31, 2021 AND 2020" prepared by, Clifton Larson Allen, LLP [the] independent financial auditors who prepared the report (referred to herein as the "CLA Report") is attached herewith as **Exhibit 5**.

14. According to the CLA Report, "[r]evenue from IOLTA receipts is recorded when received. All other income and expenses are recorded when incurred." Quoting Exhibit 5, Pg. 10. Moreover, "a monthly administrative fee is paid to the Massachusetts Legal Assistance Corporation (MLAC) based on one-twelfth of the annual operating budget as approved by the [IOLTA] Committee. MLAC provides services to the Committee including payroll,

---

than one form of URI — it can be "a locator, a name, or both." Id. at 7.

A Uniform Resource Name ("URN") "functions like a person's name," while a Uniform Resource Locator ("URL") "resembles that person's street address." Uniform Resource Identifier, Wikipedia, https://en.wikipedia.org/wiki/Uniform_resource_identifier (last visited Aug. 18, 2015).[8] "In other words: the URN defines an item's identity, while the URL provides a method for finding it." Id. Thus, as plaintiff's counsel acknowledged, the term URI — the one used in the License — is broader than the term URL, which was not, Hr'g Tr. 22:20-23:13, and these are terms of art with distinct meanings. See, e.g., BEA Sys., Inc. v. Web Balance, Inc., No. CIV.A. 03-11755-RWZ, 2006 WL 897139, at *2 (D.Mass. Mar. 31, 2006) ("URI abbreviates Uniform Resource Identifier and relates to another technical term, URL, that stands for Uniform Resource Locator.").

purchasing, *rent and other accounting and administrative services*."[3] Quoting Exhibit 5,

Pg. 11 (emphasis added) [under NOTE 4 therein]. With that said, the "budget is

reconciled to actual expenses at year-end, and the difference between the budgeted and actual

expenses is either paid to or received from MLAC subsequent to year-end." Id.

15. Furthermore, the IOLTA Committee "is not subject to federal income taxes because it is an

integral part of the commonwealth of Massachusetts constituted under the Supreme Judicial

Court. It *does not require exemption* under Section 501 of the Internal Revenue Code as an

exempt organization." Quoting Exhibit 5, Pg. 10 [under income taxes].

16. With respect to MLAC, the public records pertaining to it with the Massachusetts

Secretary of State, Corporations Division, Corporate Database are out dated. The last

filing available for MLAC, includes and is up to August 22, 2013. See Exhibit 6, Pg.

3, infra. This means, that the handbook is, one (or many) pertinent way(s) or the

other, that the information in Exhibit 1 still applies. A true and correct copy of the

Business Entity Summary for the Massachusetts Legal Assistance Corporation, the

business entity filings on record, copies of those said filings retrieved from the

Massachusetts Secretary of State website, and relevant public records pertaining to

MLAC is attached herewith as **Exhibit 6**.

17. MLAC is a "Nonprofit Corporation" that was organized in 2011, whose members of

---

[3] The full quote in said section: "A monthly administrative fee is paid to the Massachusetts Legal Assistance Corporation (MLAC) based on one-twelfth of the annual operating budget as approved by the Committee. MLAC provides services to the Committee including payroll, purchasing, rent and other accounting and administrative services. The budget is reconciled to actual expenses at year-end, and the difference between the budgeted and actual expenses is either paid to or received from MLAC subsequent to year-end. The administrative fee expenses totaled $743,367 and $678,830 for the years ended December 31, 2021 and 2020, respectively. The amount payable to MLAC was $8,299 and $56,444 as of December 31, 2021 and 2020, respectively. Additionally, the nine-member committee appointed by the Supreme Judicial Court that oversees the Committee is composed of three members nominated by each of the three charitable entities that are beneficiaries: Boston Bar Foundation, Massachusetts Bar Foundation, and the Massachusetts Legal Assistance Corporation."

the board of directors last filed 7 Winthrop Square, 2nd Floor, Boston, MA 02110" as the address on file. Quoting Exhibit 6, Pgs. 1, 11.

18. Putting aside MLAC, of the entities *currently* listed with the Massachusetts Secretary of State, Corporations Division, at 7 Winthrop Square Boston, Massachusetts 02110 ("7 Winthrop"), "The National Consumer Law Center, Inc" (notice no period after "Inc") is a nonprofit corporation which is so listed at 7 Winthrop as per a "Lobbyist Public Search" with the Massachusetts Secretary of State. See Exhibit 7, infra, Pgs. 1-2.

19. As a nonprofit corporation listed with the Massachusetts Secretary of State, The National Consumer Law Center, Inc. (notice the period after "Inc.") is two (or more) separate and distinct corporations with almost the same said name – each with a different address and records so listed (collectively referred to as "CLC"). See Exhibit 7, infra, Pgs. 1-70. A true and correct copy of the public records of CLC and other associated entities at 7 Winthrop is appended herewith as **Exhibit 7**. The public records available, on a federal public records database, namely the Trademark Electronic Search System on the United States Patent and Trademark website, shows that NCLC and the National Consumer Law Center, Inc. (notice the period after the "Inc.") are separate and distinct marks. See Exhibit 7, pgs. 128-139. Both said marks identify with The National Consumer Law Center, Inc. (notice the period after "Inc."). Id.

20. The other listed entities (which Talasazan expressly reserves to furnish and introduce in the future), at said 7 Winthrop, include but are not limited to:

- The Bankruptcy Mortgage Project, whose address is the same as, and whose website is administered by, the CLC. See Exhibit 7, Pgs. 78, 79 (ICANN Registration Data Lookup tool, 79-82).

- The Lawyers Clearinghouse on Affordable Housing and Homelessness, Inc. ("LCH") which was founded in 1988 (according to the website) but, which was formed in

7

1999 (according to the IRS filings made by LCH, by the Boston Bar Association and Massachusetts Bar Association. See Exhibit 7, Pg. 89 ("lawyersclearinghouse.org" website, about us, "*34 years* of pro bono services"), Pg. 84 ("Registrant: [] Individual [] MA, US"), Pg. 86 ("Registrar Information [] Name: Tucows, Inc." (notice the period after the Inc.); Compare Exhibit 7, Pg. 103-127 (IRS Form 990, 2017 Filing, Section J "Website: Lawyersclearinghouse.org")

21. The initial search for CLC with the Massachusetts Secretary of State, Corporations Division, website resulted in a listed filing that merged CLC as one entity. See Exhibit 7, pg. 4 (notice the compounding of two entities as one entity and the [mis]sequence of the years of the filings).

22. At or about the time that the petition for discipline was filed against me, public records indicated that [Defendant] Dorothy Anderson purchased a single family residential house located at 32 Ick Road Whitingham, Vermont 05361, the purchase price for which was $660,000.00. See Exhibit 8, infra. A true and correct copy of the public records (including instruments executed by or on behalf of Dorothy Anderson) are attached herewith as **Exhibit 8**. (See Pages 205-287)

23. The current address that is listed as the address on file for MLAC is not on file with the State of Massachusetts, as many public record databases that I could search. A true and correct copy of the records so searched concerning MLAC is appended herewith as **Exhibit 9**.

24. The Covid-19 public health emergency was, and still is, an ongoing event which, between Talasazan and the named Defendants, the latter were, or should have been more, prepared to handle Covid-19 than, the former. A true and correct copy of the "Preparing for a Pandemic [] An Emergency Response Benchbook and Operational Guidebook for *State Court* Judges and Administrators" dated 2016 is appended herewith as **Exhibit 10**.

25. Among other states in the union, Massachusetts contributed its incoming and outgoing case

statistics since the Covid-19 pandemic and public health emergency were so declared, for publication with the Court Statistics Project. A true and correct copy of the "Pandemic Caseload Highlights" report, published by the "Court Statistics Project" and dated "August 2022" is appended herewith as **Exhibit 11**. Of particular concern to Talasazan and to the public, more broadly speaking, is, this report presents, among other things therein:

- The lack of access to the courts during the corona virus pandemic means that the information supplied was not gathered or verified in its (pre-pandemic) usual manner.

- Among other things, as per the first amended complaint in the instant case, because the clerks of the courts in the commonwealth had discretion and control over cases and case dockets unseen before in its history, there is no way to know whether or not the case docket – especially those involving pro se litigants – was not altered and then disposed for statistical purposes, and thus, the data reflects merely the superficial appearance of objective data.

- The report encourages "[b]est practice recommendations include: [] Reducing the number of continuances with firm rule-based continuance policies; [] [r]esolving cases with fewer hearings[.]" Quoting Exhibit 11, Pg. 7.

26. The public records relating to Exhibit 10 and Exhibit 11 are paid from *federally funded* grants to the Commonwealth of Massachusetts, among other states. A true and correct copy of the Federal Register (the source from) where Talasazan obtained the said records in said Exhibits is appended herewith as **Exhibit 12**.

27. Talasazan's decision to petition and file the instant case is a result of due diligence, which occurred after Talasazan conducted a thorough review of previous attorney discipline cases as published opinions decided by the Supreme Judicial Court, oral arguments via youtube.com and Suffolk University's webpage portal for Supreme Judicial Court (the most recent of which are, oddly, cabined in the archives).

28. Talasazan requested from the Board of Bar Overseers past cases involving the Board proceedings, one such case, namely "In the Matter of Ablitt" Talasazan read carefully, and even interviewed the attorney who handled the case for the Attorney in the bar discipline proceedings. A true and correct copy of the Board of Bar Overseers "In the Matter of Ablitt" case is appended herewith as **Exhibit 13**.

29. As stated in the First Amended Complaint in the instant case, Talasazan recalls that Assistant Clerk Stephen Cronin had called for someone whom Talasazan reasonably believed was a Bar Counsel investigator, namely Matthew Stewart. On or about August 24, 2021 Talasazan wrote a letter to Dorothy Anderson requesting that he interview Defendant Stewart. The reason Talasazan made said request was because Talasazan conducted due diligence with regard to Stewart, and cursorily conducted due diligence with regard to Microsoft Teams, and reasonably foresaw the risk of Stewart using the Microsoft Teams application for the wrong purposes. Talasazan also realized that Dorothy Anderson ("Anderson") was not really working on the investigation, but Stewart was so working. Moreover, Talasazan cursorily reviewed the terms and conditions relating to Microsoft Teams *at that time* and realized that Microsoft Teams videos may be edited. Talasazan also realized that his internet protocol address had been captured by Citrix, which raised a conflict with his rights as a resident of California and the Bar Counsel's policy of having to partake in a Microsoft Teams video deposition.

30. Talasazan conferred with Anderson in writing and over the phone (phone being broader in detail and scope of subjects so discussed) regarding the preceding said matter. A true and correct copy of the letter Dorothy Anderson had sent to Talasazan shortly after the said discussion is attached herewith as **Exhibit 14**. At the time these

events were occurring, Talasazan was virtually penniless and tempered by the events that had occurred in the case he had brought before the Single Justice of the Supreme Judicial Court, which was not heard. Suffice it to say that Talasazan was trying to pick himself up by his bootstraps and build his life, at least financially, back up again with the tools he still had – his ability to be a lawyer or law clerk or legal secretary (the latter two in California, until he could apply to sit for the Bar Examination in California without the Board passing, what Talasazan fears would be, its unjust suppositions).

31. Under the undue influence and coercion of Dorothy Anderson's threat to have Talasazan administratively suspended, and even worse branded as mentally or physically incompetent, Talasazan reasonably believed that he was being extorted for invoking rights which, Anderson, as an agent of the commonwealth, and as a matter of grace and recognition of the laws of California, would recognize and respect but did not. And so, Talasazan paid out of his own pocket and travelled to Massachusetts for said Microsoft Teams video deposition with the hope and faith that the progeny of cases he had read about the Bar Counsel, being the zenith of ethical attorneys and so forth, true and as real as what is said on paper. Talasazan does not believe, at least with regard and with respect to how he has been treated by the State Defendants in the instant case, is true.

32. During the said discussion with Dorothy Anderson, preceding Exhibit 14, supra, and during phone calls thereafter with Dorothy Anderson, Talasazan disclosed and described in detail the spyware issue that had occurred involving Apple Inc.

33. Talasazan had explained to Dorothy Anderson that, because Talasazan had

downloaded software from Fireeye, (e.g., among other applications available for download and use on the iPhone operating system at that time, "Memoryze") he can reach out to Fireeye and request for an analysis of the data it may be able to capture. Putting these said matters in writing was something which Talasazan was apprehensive to do or did not do at all. Talasazan approached Apple in this regard in confidence, and wanted it to be kept that way. Talasazan did not ask for money from Apple at that time, and consistent with the foregoing, Talasazan so informed Anderson about it.

34. Talasazan did so reach out to, if Talasazan recalls correctly, Mandiant, formerly known as Fireeye, Inc. – the two entities merged or one acquired the other (and thereafter, Google acquired Mandiant, and upon information and belief, Mandiant is the cybersecurity entity for Google Drive currently) and spoke with a sales representative, who explained that the cost associated with retrieving such data is expensive, and Talasazan realized that he could not afford it. Shortly after these phone calls, a drop-down agreement appeared on Talasazan's phone (ending in 5252 and 4232) relating to Fireeye or Mandiant, Inc. – which Talasazan could not print; due to the pixelation of the screen of the phone at that time, Talasazan could barely even read; and, without any option to leave said agreement on the screen (e.g. pressing the home button, or turning off and turning on the phone) Talasazan had to agree or part with using his phone, so Talasazan (while reserving his rights) agreed. Shortly thereafter, Google acquired Mandiant. Talasazan reasonably believes that Dorothy Anderson caused the said drop down agreement to occur, and Talasazan does not believe that the real estate purchase referenced in Exhibit 8, supra, was

anything but a coincidence, it must have been a direct case and effect. Up to and including filing the petition for discipline, so that Talasazan was out of the picture, Anderson's share or kickback therefrom is apparent via the real estate so purchased (real estate record is now obfuscated) is a direct result of the misuse of her official powers and duties.

35. Talasazan did not ask for money from Apple Inc. when he approached Apple Inc. regarding the spyware he suspected on his phone beginning from about May, 2021. Since bringing the instant case, things have changed and, especially because Talasazan experienced again the issues of being unable to read terms and agreements to a software update with which security issues on Talasazan's phone, particularly because it was in or about the time when Talasazan filed the instant case, which he had been experiencing, and that Apple Inc. was attempting to make him enter, agree to, and accept in the same pixelated manner as before, Talasazan reserves his rights against Apple Inc. in the foregoing regard and respect. A true and correct copy of the pixelation of Talasazan's iPhone in or about the time the instant case was filed is Attached herewith as **Exhibit 15**.

36. Talasazan has been trying to marshall evidence with respect to matters he had asserted or stated in the instant case. A true and correct copy of the Freedom of Information Act (FOIA) request Talasazan had made to the Secretary of State's office is attached herewith as **Exhibit 16**. A true and correct copy of the response to the said FOIA request Talasazan had made to the Secretary of State's office is attached herewith as **Exhibit 17**. A true and correct copy of Talasazan's appeal to the Secretary of State's Office in reply to the Secretary of State's said response is

attached herewith as **Exhibit 18**.

37. Talasazan has been trying to marshall evidence with respect to matters he had asserted or stated in the instant case. A true and correct copy of the FOIA request e-mail and Talasazan had made to the General Services Administration is attached herewith as **Exhibit 19**. A true and correct copy of the public records Talasazan had gathered and reviewed in support of making said FOIA request is attached herewith as **Exhibit 20**. See also Exhibit 2, Objection to and Motion to Correct Docket Instruction.

38. Talasazan has been trying to marshall evidence with respect to matters he had asserted or stated in the instant case. A true and correct copy of Talasazan's FOIA request to the United States Patent and Trademark Office in relation to Neopost is attached herewith as **Exhibit 21**.

39. Talasazan had raised the issues concerning "maioltasecure.com" and Ting as well as Tucows to ICANN. A true and correct copy of the letters so sent to ICANN is attached herewith as **Exhibit 22**.

40. Before approaching the Secretary of State (U.S.) with the FOIA request, supra, Talasazan had conducted his due diligence with regard to Quadient formerly known as Neopost. Before asserting the matters regarding said Neopost to the Court in the instant case, Talasazan had conducted his due diligence in support of said assertions. A true and correct copy of the records Talasazan collected and reviewed are attached herewith as **Exhibit 23**. Page 1 indicates the current true and correct address for the registered agent to so serve Neopost. The only reason why Talasazan has managed to keep the record from the Secretary of State of the State of Connecticut is because he

printed it and kept it safe; said records were deleted off of Talasazan's hard drive.

41. When the petition for discipline was filed against Talasazan, the Board of Bar Overseers website had indicated that "disciplinary proceedings [had been] filed" but, since arguing and presenting, among other things, the Motion for Extension of Time and conferring with Attorney Marks about this case, the webpage search concerning Talasazan have been changed to "proceedings commenced" and most recently "disciplinary proceedings pending" which further corners Talasazan to defend his rights vigorously in the instant case, and further diminishes any good faith the State defendants purport to have, if any, with respect to Talasazan seeking relief from the instant Court, which was "allowed without objection".

42. As Talasazan had already asserted in the instant case, the State Defendants have been using a dual system of mailing items to Talasazan and ultimately, deceive him. A true and correct copy of the Board of Bar Overseers mail envelope, marked or franked by Neopost and so dated "11/23/2022" is affixed herewith as **Exhibit 24**. A true and correct copy of the "OFFICE OF THE BAR COUNSEL" with "D[orothy] [A]nderson" so initialed in blue ink thereabove, mail envelope, with the address "99 HIGH STREET BOSTON, MASSACHUSETTS *02110-2320*" (emphasis added) marked or franked by Neopost and so dated "12/07/2021" is affixed herewith as **Exhibit 25**. A true and correct copy of the Board of Bar Overseers mail envelope, marked or franked by "*PITNEY BOWES*" (emphasis added) and so dated "08/02/2022" is affixed herewith as **Exhibit 26**. A true and correct United States Postal Service address look up search of "99 HIGH STREET BOSTON MA" is appended herewith as **Exhibit 27**.

43. Upon information and belief, Anderson did execute a domestic receipt return label, which was so delivered to Talasazan. A true and correct return receipt so executed by Anderson is affixed herewith as **Exhibit 28**. *Compare* signature with respect to 466 Lowell Avenue Newton, Massachusetts 02460. *But See* Exhibit 8, Power of Attorney.

44. Talasazan *did* send a notice of material breach of the terms and conditions by and between the State Defendants and Microsoft Corporation. Thereafter, Talasazan sent a notice to preserve evidence to Defendant Microsoft Corporation. A true and correct copy of the said notice is attached herewith as **Exhibit 29**.

45. As stated in the First Amended Complaint, among other things, Talasazan has asserted that Citrix captures his personal information. A true and correct public record from the United States Patent and Trademark Office in relation to Citrix, Inc. is appended herewith as **Exhibit 30**.

46. Upon information and belief, Talasazan knows that most, if not all, documents purportedly signed by Anderson were not really so signed by Anderson, rather Stewart or Anderson's secretary, namely Anne T Brown, affixed the signature on her behalf, concerning Talasazan in both file investigations. A true and correct copy of the "Remote respondent meeting guidelines (002).pdf" document properties is appended herewith as **Exhibit 31**. A true and correct copy of "Talasazan – Mtg req ltr.pdf" document properties is affixed herewith as **Exhibit 32**. If Anderson truly authored any document, if any at all, in relation to the file investigations concerning Talasazan, it would be presumable that the original native format metadata of each document which affixes Anderson's signature would be authored last by *Anderson*, not by any of her assistants or investigators, because she is the only licensed attorney

by and between Anderson and the investigator and/or assistant.

47. At the early stages of the first investigation, Talasazan notified Anderson that Stewart was writing letters on Anderson's behalf that, based on the properties of the documents, Anderson did not really sign. A true and correct monochrome copy of the letter dated August 5, 2021 is appended herewith as **Exhibit 33**.

48. Talasazan also notified Anderson that Stewart was not acting under her "supervision" and warned Anderson about the issues associated to the virtual remote deposition on August 24, 2021 – about a month before the said deposition was to take place. A true and correct monochrome copy of the said notification in this regard is attached herewith as **Exhibit 34**.

49. Immediately after the Microsoft Teams virtual deposition taken on or about September 23, 2021 Stewart requested Talasazan's financial records. A true and correct copy of the e-mail objecting to said request is attached herewith as **Exhibit 35**. With that said, as to the records Stewart requested which Talasazan *had not* objected to, Talasazan upheld his duty to cooperate in good faith, responded and turned over to Bar Counsel those records in short order. A true and correct monochrome copy of the letter sent to Anderson is attached herewith as **Exhibit 36**.

50. When Talasazan had reason to believe that he will be deposed again via the Microsoft Teams platform, Talasazan conducted due diligence to ensure that that spoliation of evidence would not occur again as it had before. A true and correct copy of the documents Talasazan had sent to Microsoft Corporation, among others, is attached herewith as **Exhibit 37**.

51. Talasazan obtained the Agreement in the First Amended Complaint by making a

public records request. A true and correct copy of the said request is attached herewith as **Exhibit 38**. A true and correct letter to the specific person Talasazan had been directed to is attached herewith as **Exhibit 39**. A true and correct copy of the letter Talasazan had sent making a public request from the Defendant Board of Bar Overseers, which was denied, is attached herewith as **Exhibit 40**.

52. Bank of America has not acted in good faith with Talasazan. By way of example, among other things Talasazan expressly reserves to introduce, raise or argue in the future, when Talasazan had moved to quash the second subpoena in the *administrative proceeding* issued by the Defendant Board of Bar Overseers at the Defendant Bar Counsel's request, Bank of America received a copy from Talasazan. In response, Bank of America informed Talasazan that it would "continue processing the request for information [?] once [Bank of America would] receive *a court order* on the Motion." *See* Exhibit 38, infra. The letter identified the client as "Harel Talasa" and thus did not name Talasazan truly nor correctly, but instead, based on Talasazan's Bank of America online account login username – for his personal and business accounts -- Talasazan was unreasonably described. A true and correct monochrome copy of the Bank of America letter, from "PO BOX 15047 [] Wilmington, DE 19850-5047" titled "Subpoena Response" is attached herewith as **Exhibit 41**.

53. Talasazan had confirmed the idenitties of Defendants Anderson and Stewart with an agent from Defendant Microsoft Corporation. A true and correct copy of the demand to preserve and specific identifiers to so preserve evidence as requested by Defendant Microsoft Corporation is attached herewith as **Exhibit 42**.

54. Talasazan has noticed changes to the Massachusetts geographic information survey system (GIS). Refer to 03/17/2023 49 Plaintiff's Objection to Docket Sheet Instruction and MOTION for Orderly Sequences Ruling and Corrected Docket Sheet filed by Harel Talasazan. (Currie, Haley) (Entered: 03/17/2023) and 03/17/2023 50 MEMORANDUM in Support re 49 Plaintiff's Objection to Docket Sheet Instruction and MOTION for Orderly Sequences Ruling and Corrected Docket Sheet filed by Harel Talasazan. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Gmail Attachment) (Currie, Haley) (Entered: 03/17/2023). A true and correct copy of the property records on said GIS is attached herewith as **Exhibit 43**.

55. Talasazan has been in communication with Attorney Marks in relation to the issues with the State Defendants. A true and correct copy of such a correspondence is attached herewith as **Exhibit 44**.

56. Talasazan has been continuously notified of purported default entered against him. A true and correct copy of such notice by e-mail is attached herewith as **Exhibit 45**.

57. Talasazan has conducted due diligence before contacting the United States Secretary of State. A true and correct copy of public records Talasazan has reviewed are attached herewith as *Exhibit 46*, **Exhibit 47, Exhibit 48, and Exhibit 49**.

58. There are documents relating to Belmont Savings bank that have been removed from public records and obfuscated. A true and correct copy of such records are attached herewith as **Exhibit 50**.

59. Talasazan has noticed changes to the Massachusetts geographic information survey system (GIS). Refer to 03/17/2023 49 Plaintiff's Objection to Docket Sheet Instruction and MOTION for Orderly Sequences Ruling and Corrected Docket Sheet

filed by Harel Talasazan. (Currie, Haley) (Entered: 03/17/2023) and 03/17/2023 50 MEMORANDUM in Support re 49 Plaintiff's Objection to Docket Sheet Instruction and MOTION for Orderly Sequences Ruling and Corrected Docket Sheet filed by Harel Talasazan. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Gmail Attachment)(Currie, Haley) (Entered: 03/17/2023). A true and correct copy of the property records on said GIS is attached herewith as **Exhibit 51**.

60. Talasazan obtained the Agreement in the First Amended Complaint by making a public records request. A true and correct copy of the first written correspondence he had made to Deputy General Counsel Myers is attached herewith as **Exhibit 52**

61. Talasazan has been continuously notified of purported default entered against him. A true and correct copy of such notice by e-mail is attached herewith as **Exhibit 53**.

62. Talasazan lost his job at the law firm where he had been working in or about November 22, 2023. Talasazan has had to rely primarily on his wife, again, to support him. Talasazan's wife is currently seeking to divorce Talasazan, and Talasazan attributes these bar disciplinary investigations and purported proceedings, above, and having no better choice but to file and proceed with the instant case, devote the time and energy to clear his good name as the primary cause of the strife and divide between Talasazan and his wife.

///

///

///

///

///

I, Harel Talasazan, declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Signed this *16* day of March 2023 in Los Angeles, California.

Harel Talasazan, Plaintiff
520 N Kings Road Apt. 305
+Los Angeles, California 90048
hareltala@gmail.com